*In re* ESTATE OF CELIA F. KAPLAN, Deceased (Abraham Agran, Co-Ex'r of the Estate of Celia F. Kaplan, Petitioner-Appellee, v. Joel B. Furlett *et al.*, as Co-Ex'rs of the Estate of Arthur Furlett, Respondents-Appellants (Franklin J. Furlett *et al.*, Intervening Petitioners-Appellees)).

First District (6th Division)   Nos. 1—90—1444, 1—90—2499 cons.

Opinion filed September 6, 1991.

Lindenbaum, Coffman, Kurlander, Brisky & Hayes, Ltd., of Chicago (Leon E. Lindenbaum, of counsel), for appellants.

Katz, Randall & Weinberg, of Chicago (Jeffrey H. Bunn, of counsel), for appellees Franklin J. Furlett, June Kerstein, Rochelle Goldsholl, and Esther Furlett.

Agran & Agran, Ltd., of Chicago (Martin S. Agran, of counsel), for other appellee.

JUSTICE McNAMARA delivered the opinion of the court:

This consolidated appeal, which arises out of the probate of the estate of Celia Kaplan, presents the following issues: (1) whether a 1937 will constituted a joint and mutual will; and (2) whether a joint account established by Celia Kaplan was proved to have been a joint tenancy of convenience rather than a true joint tenancy.

On December 9, 1937, Morris and Celia Kaplan executed a one-page testamentary instrument which provided in its entirety as follows:

> ## "LAST WILL AND TESTAMENT
> ### OF
> ### MORRIS A. KAPLAN AND CEL F. KAPLAN
>
> KNOW ALL MEN BY THESE PRESENTS that we Morris A. Kaplan and CeL F. Kaplan, husband and wife, both residing in the City of Chicago, County of Cook and State of Illinois, and being of sound and disposing mind and memory and both being of lawful age, do make, publish and declare this instrument to be jointly as well as severally our last will and testament, hereby revoking all former wills.
>
> *FIRST*: We direct all just debts and funeral expenses to be fully paid.
>
> *SECOND*: We direct that all of our property, both real and personal, at the time of the death of either of us, shall be held

by the survivor during his or her life time, the use and income thereof, to be enjoyed by such survivor as he or she shall deem best during the remainder of the life of such survivor.

*THIRD*: At the death of the survivor, after all funeral expenses and debts have been paid, the above property shall be distributed as follows:— To the parents of Morris A. Kaplan, namely Eva Kaplan and David Kaplan and the parents of Cel F. Kaplan, namely Sarah Furlett and Joseph Furlett, in equal shares, to share and share alike during their life time and in the event that they do not survive, then it is to pass to their heirs in proportion to their shares.

*FOURTH*: Lastly we constitute and appoint Nathan J. Kaplan and Irwin R. Furlett to be the executors of this our last will and testament hereby revoking all former wills by us made and it is our expressed wish that said executors be appointed to act without bond.

IN WITNESS WHEREOF, we have hereunto set our hand and seal this 9th day of December A.D., 1937.

/s/ Morris A. Kaplan

/s/ Celia F. Kaplan"

Morris Kaplan died on January 6, 1977, leaving no surviving descendents, and the 1937 will was admitted to probate in the circuit court of Cook County. On September 14, 1985, Celia executed a duly witnessed will, which purported to revoke the 1937 will. The introductory paragraph of the 1985 will stated: "I, Celia F. Kaplan, Chicago, Illinois, make this my last will and revoke all former wills and codicils by me made." The 1985 will gave half of the residuary estate to her husband's brothers, sisters, nieces and nephews. The 1985 will gave the remaining one-half of her estate, valued in excess of $1 million, to Arthur Furlett, her only surviving sibling, and made nominal bequests to her nieces and nephews, including Rochelle Goldsholl, Franklin Furlett, Jr., June Kerstein, Norman Furlett and Joel Furlett, who are parties in this case. The 1937 will, by contrast, gave Arthur Furlett about one-eighth of the estate. The 1985 will also made several charitable bequests that were absent in the 1937 will.

Celia died in June 1988 and her 1985 will was admitted to probate on August 25, 1988. The intervening petitioners (petitioners) subsequently filed a supplementary proceeding to enforce the 1937 will and a summary judgment motion that the 1937 will was a joint and mutual will that was irrevocable after Morris' death. Petitioners are Ce-

lia's heirs, who are legatees under the 1937 will: Franklin J. Furlett and Rochelle Goldsholl (children of Celia's deceased brother, Frank Furlett); June Kerstein (child of Celia's deceased brother, Irwin); and Esther Furlett (wife of deceased brother, Sanders Furlett). Abraham Agran, co-executor of Celia's estate, is also a petitioner.

Respondents (Joel B. Furlett, Norman Furlett, Annette Furlett and Leon Lindenbaum as co-executor of the estate of Arthur Furlett) opposed petitioners' summary judgment motion on the ground that the 1937 will failed to satisfy the criteria for a joint and mutual will under Illinois law. They argued that the language of the 1937 will was ambiguous, and, therefore, summary judgment was inappropriate. After a hearing, the court entered summary judgment that the 1937 document was a joint and mutual will which became irrevocable by Celia Kaplan upon the death of Morris Kaplan. Respondents appeal from this order.

In the second case, consolidated here on appeal, petitioner Abraham Agran, co-executor of Celia's estate, filed a citation petition in the circuit court of Cook County requesting that a joint savings account in the approximate sum of $182,000 be added to the estate's inventory. The account was in the names of Celia Kaplan and Arthur and Joel Furlett. The following evidence was adduced at the March 14, 1989, evidentiary hearing to determine whether the money in the joint account at First Chicago belonged to Celia's estate or to respondents as surviving joint tenants.

Bonnie Clyde, account executive at First Chicago, testified that after speaking with Arthur Furlett and Celia, Clyde added Arthur and Joel Furlett as signatories to Celia's account to help her pay her bills. Clyde testified that she did not specifically remember talking to Celia, but that it was her "normal business procedure" to explain the different options to a client either verbally or via a "detailed letter" before issuing new signature cards. Clyde testified that she discussed with both Celia and Arthur Furlett the different options for adding signatories, including the power of attorney and the joint tenancy. She explained to them that a power of attorney grants another the power to sign on the owner's behalf, which power ceases upon death. After speaking with Celia, Clyde filled out the cards per Celia's request, then sent the completed cards to Celia for her signature, enclosing a handwritten note which stated in relevant part as follows:

> "To change the title on your checking account, you and the two new signers will need to each sign both of the enclosed cards next to your name. You should each also verify and complete the personal information about each of you. Please just

return these cards *** to add the two new co-signers and I will take care of the rest ***."

Clyde testified that although she does not specifically recall, she "assumes" that she spoke with Celia because she did not write a longer, more detailed letter explaining the differences between joint tenancy and power of attorney accounts.

Celia signed the cards and returned them to Clyde with the following note, drafted by Arthur and signed by Celia:

"Enclosed are the cards that you recommended—I am confirming both my brother Arthur M. Furlett and his son Joel B. Furlett to sign check [sic] on my current checking account."

Petitioner offered no evidence that demonstrates the source of the funds in the joint account at First Chicago. A statement introduced at the hearing indicated that as of January 24, 1989, the balance of the account was $227,788.28 with a 4.7% rate of interest. In April 1988, Celia also held two certificates of deposit and a savings account of $175,000 at First Chicago.

Cathy Vellios, employee of the Peterson Bank, where Celia also held a checking account, testified that she spoke with both Arthur Furlett and Celia in April 1988. As a result of these conversations, Vellios added two new signatories, Arthur and Joel Furlett, to Celia's checking account. No request was made to transfer the account to joint ownership.

The parties stipulated that: at the time of Morris' death in January 1977, the estate's net value after taxes was $1,100,000; during the period from his death in 1977 to Celia's death in June 1988, the estate's assets and property generated about $1,039,000; Celia also received approximately $125,000 net in social security and pension payments during this period, but earned no other income. The record also established that between September 1985 and March 1988, Celia gave respondent Joel Furlett and his wife a total of $45,050.

After a hearing, the trial court in an oral opinion rendered July 20, 1990, found that the presumption of a gift arising from the joint account was overcome by clear and convincing evidence and, accordingly, found in petitioner's favor, that joint account funds were an asset of Celia's estate. The court stated that it lacked sufficient evidence to determine whether the funds in the joint account represented principal or income, commenting that if they represented principal, the creation of the account would violate the joint and mutual will, if valid. The court entered a written order pursuant to these findings on August 1, 1990. Respondents (Norman Furlett, Joel

Furlett and Leon Lindenbaum, as co-executor of the estate of Arthur Furlett) appeal.

The issue on appeal in the first case is whether the trial court properly entered summary judgment that the 1937 testamentary instrument was a joint and mutual will which became irrevocable upon Morris' death. Respondents do not dispute that the 1937 instrument is a joint will, but claim that the will does not unambiguously establish that the testators intended it to be joint and mutual. We conclude that the trial court correctly determined that it was a joint and mutual will and accordingly affirm its decision.

■■■■ A trial court is required to ascertain the intent of the testator, and our concern on appeal is whether the trial court's construction accomplished the testator's intention. (*King v. Travis* (1988), 170 Ill. App. 3d 1036, 524 N.E.2d 974.) Moreover, when the four corners of the document reveal no ambiguity about the testator's intentions, the trial court may properly enter summary judgment. (See *Young v. Young* (1991), 210 Ill. App. 3d 912, 569 N.E.2d 1; *King v. Travis*, 170 Ill. App. 3d 1036, 524 N.E.2d 974.) A joint and mutual will is a single testamentary instrument which contains the wills of two or more persons, executed jointly, and requires the survivor to dispose of the property according to the will's provisions. (*Young v. Young*, 210 Ill. App. 3d 912, 569 N.E.2d 1.) Our courts in determining whether a will is joint and mutual have recognized various guidelines, including the following five distinguishing characteristics:

> "First, the court looks to the label the testators have assigned to the will. Second, the court looks to the use by the testators of common plural terms such as 'we' and 'our' as further evidence of the testators' intent to make a joint and mutual will. Third, the court looks for a pooling of the testators' interests. Fourth, the court looks for reciprocal provisions in the will; whether the testators made a disposition of the entire estate in favor of the survivor of them. Finally, the court looks for a common dispositive scheme under which the parties dispose of the common fund by bequeathing it to their heirs in approximately equal shares." (*King v. Travis* (1988), 170 Ill. App. 3d at 1042, 524 N.E.2d at 978-79.)

Although courts commonly use these five characteristics of joint and mutual wills as guidelines, each case must be viewed individually. (*In re Estate of Signore* (1986), 149 Ill. App. 3d 904, 501 N.E.2d 282; *Rauch v. Rauch* (1983), 112 Ill. App. 3d 198, 445 N.E.2d 77.) Indeed, this court in *Signore* considered several other criteria in addition to those indicated in *Rauch*, noting that the *Rauch* court's list of com-

mon characteristics was not "exclusive." *Signore*, 149 Ill. App. 3d at 908, 501 N.E.2d at 284.

■ Applying the foregoing principles, we conclude that the 1937 document was a joint and mutual will. As to the first trait, the parties did not anywhere refer to the document as their "mutual will" or their "joint and mutual will," nor do any of the paragraphs use the word "mutual" in referring to the instrument. However, we are not precluded from finding an instrument to be a joint and mutual will merely because it lacks such label. (See *In re Estate of Arnold* (1986), 142 Ill. App. 3d 258, 491 N.E.2d 458; *In re Estate of Schwebel* (1985), 133 Ill. App. 3d 777, 479 N.E.2d 500.) Moreover, even though the preamble defines the will as "jointly as well as severally our last will and testament," such terminology need not alter our conclusion that the parties intended to create a joint and mutual document. In *Arnold*, this court found a will to be joint and mutual despite use of the word "severally" in the instrument. The court relied upon the equal treatment of each side of the family, noting that it "would not be logical to consider that the testator intended to give the survivor the power to upset the scheme by a contrary testamentary disposition merely because he used the word severally in the instrument." (*Arnold*, 142 Ill. App. 3d at 263-64, 491 N.E.2d at 462.) As in *Arnold*, the testators here obviously provided for equal treatment of both families and, as such, their inclusion of the term "severally" does not render their intent ambiguous.

Second, the testators used plural terms throughout the will, such as "we direct," "we appoint," "we constitute," "our property," "our last will," "our expressed wish," and "death of either of us."

Third, the following language directs the pooling of the parties' interests into a common fund: "We direct that all of our property, both real and personal, at the time of the death of either of us, shall be held by the survivor during his or her life time, ***." This clause gives the surviving spouse a life estate in all of the property covered under the will, thereby pooling the parties' interests into a common fund.

Fourth, the will contains reciprocal provisions as indicated in the second paragraph, which provides for reciprocal development of the property depending on their respective deaths. *King v. Travis*, 170 Ill. App. 3d 1036, 524 N.E.2d 974.

Finally, the will disposes of the common fund through a common dispositive scheme which gives Celia's and Morris' heirs approximately equal shares of the property owned by the testators. The third paragraph distributes all of their property to their parents "in equal

shares," if they survive, or to their heirs "in proportion to their shares."

Respondents maintain that the will does not satisfy this criterion because it fails to limit the survivor's use of the property, and therefore lacks a common distributive scheme, relying on *King v. Travis*. Rather, respondents contend that the will gives the survivor the right to "invade the corpus for life." We disagree with respondents' reading of the will and their reliance on *King*.

In *King*, this court affirmed the trial court's entry of summary judgment determining that the testamentary document did not create a common distributive scheme and, therefore, was not a joint and mutual will. The will in *King* gave the survivor all property in "Fee Simple Absolute Forever." According to the *King* court, such language unambiguously gave the survivor the power to "dispose of the entirety of the will's bounty." (*King*, 170 Ill. App. 3d at 1043, 524 N.E.2d at 979.) We find *King* distinguishable on this point. Paragraph two of the will in this case provides that all property covered under the will "shall be held by the survivor during his or her life time, *the use and income thereof, to be enjoyed by such survivor as he shall deem best during the remainder of the life of such survivor*." (Emphasis added.) Respondents maintain that, under *King*, this language shows an intention to give the survivor the absolute right to expend or consume all of the property during his or her lifetime. We disagree. The language allows the survivor to enjoy only "the use and income" of the property as he so chooses during his lifetime. However, the language explicitly directs the survivor to hold the property during his lifetime. The survivor's right to enjoy the property as he "deems best" extends only to the "use and income" of the property during the survivor's lifetime. We do not believe that this language gave the survivor the right to dispose of the property entirely. Rather, we believe this language shows the parties' intention to create a life estate in the property for the survivor. (See *Gaston v. Hamilton* (1982), 108 Ill. App. 3d 1145, 440 N.E.2d 190.) By contrast, the will in *King* unambiguously created a fee simple interest in the survivor.

*King* is also distinguishable because there the only legatees were the husband's heirs, namely his son and daughter by women other than the testator wife. The will did not divide property equally between the parties' families. By contrast, the Kaplans' will distributes the property to both testators' heirs in approximately equal amounts. *Cf. Buettner v. Rintoul* (1990), 195 Ill. App. 3d 874, 553 N.E.2d 6.

We also find *Larison v. Record* (1987), 117 Ill. 2d 444, 512 N.E.2d 1251, instructive. In *Larison*, our supreme court concluded that the

testators intended to give the survivor the "unfettered right" to decide the estate's disposition after the survivor's death, relying upon the provision which passed the estate to the survivor "to be his or her sole and absolute property forever." (*Larison*, 117 Ill. 2d at 452, 512 N.E.2d at 1254-55.) The court stated that this language created a fee simple interest and demonstrated that the testators intended to give the survivor the right to determine the estate's distribution. Unlike *Larison*, the testators' creation of a life estate in the survivor here belies respondents' contention that the testators intended to give the survivor the right to dispose of the property during his lifetime. For the foregoing reasons, we reject respondents' argument that the will lacked a common dispositive scheme.

██ Respondents also maintain that the will is not joint and mutual because it does not contain an agreement of mutuality or an agreement that revocation was not to be made without the consent of both testators, relying on *In re Estate of Signore*. In *Signore*, this court upheld the trial court's conclusion that the parties' will was not joint and mutual. The court relied on the introductory paragraph, which provided a "full reservation by both or either of us to change the terms hereof at any time." (*Signore*, 149 Ill. App. 3d at 908, 501 N.E.2d at 285.) The *Signore* court found that this language evidenced the parties' intent to keep the will revocable at any time. Such express reservation of the power to revoke is absent here and distinguishes *Signore* from this case. Close scrutiny of the second and third paragraphs of the will here reveals that the will was intended to be irrevocable upon the death of either of the testators. Paragraph two directs that all property possessed at the time of the death of one of the testators becomes the survivor's property, and paragraph three directs the property division to both families upon the survivor's death. From these provisions, it is apparent that the testators did not intend to give the survivor the power to revoke the will. (*In re Estate of Arnold*, 142 Ill. App. 3d 258, 491 N.E.2d 458.) Moreover, the will's provision for equal treatment of the testators' families is further evidence that the testators did not intend to give the survivor the power to alter the disposition. *In re Estate of Arnold*, 142 Ill. App. 3d 258, 491 N.E.2d 458.

In summary, the testators here made dispositions in favor of each other, pooled their interests, created a common dispositive scheme giving their respective families equal shares, and used common plural terms throughout the will. Based upon the existence of the five characteristics in the will, we are persuaded that the trial court correctly concluded that the instrument unambiguously established that Celia

and Morris intended to make a joint and mutual will and accordingly entered summary judgment in petitioners' favor.

We next consider whether the trial court properly granted petitioner's citation to recover the proceeds of Celia's checking account at First Chicago. On appeal, respondents (Joel B. Furlett, Annette Furlett and Leon Lindenbaum, co-executors of Arthur Furlett's estate) argue that petitioner failed to establish by clear and convincing evidence that Celia did not intend to create a joint tenancy. Additionally, respondents maintain that if the 1937 will was a valid, joint and mutual will, the creation of the joint account did not violate the 1937 will. We need not consider the latter contention because we hold that the evidence overcame the presumption of gift.

■■ ■ The transfer of property into joint tenancy creates a presumption of a valid gift to the surviving joint tenant. (*In re Estate of Guzak* (1979), 69 Ill. App. 3d 552, 388 N.E.2d 431.) This presumption is not conclusive, but one who challenges the gift must present clear and convincing evidence of the absence of donative intent. (*Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 202 N.E.2d 470.) In determining whether the donor intended to transfer his interest at death to the surviving joint tenant, the court may consider the facts surrounding the creation of the account. (*In re Estate of Schneider* (1955), 6 Ill. 2d 180, 127 N.E.2d 445.) Moreover, evidence that the deceased created the account for his mere convenience indicates lack of donative intent. (*In re Estate of Elliott* (1975), 33 Ill. App. 3d 1046, 339 N.E.2d 378.) The form of the agreement is not conclusive regarding the parties' intentions (*In re Estate of Schneider*, 6 Ill. 2d 180, 127 N.E.2d 445) and each case must be evaluated on its own facts and circumstances. *In re Estate of Hayes* (1971), 131 Ill. App. 2d 563, 268 N.E.2d 501.

■■ We believe that the trial court correctly found that petitioner overcame the presumption of donative intent by clear and convincing evidence and properly held that the proceeds of the account were assets of the estate. The circumstances surrounding the creation of the account indicate that Celia added the names of Arthur and Joel Furlett as co-signers on her account in order to help her pay her bills. The evidence shows that both Arthur Furlett and Bonnie Clyde recognized the payment of bills as Celia's main concern. Clyde testified that Celia "was concerned that they be able to pay bills during her life and also if they had to do something after she died." Clyde stated that this was also Arthur Furlett's concern. Moreover, Celia's note to Clyde, drafted by Arthur and signed by Celia after receipt of the signature cards, explicitly refers to the new signatories' power to sign

checks, but fails to refer to any ownership interest. We believe that this evidence demonstrates that Celia created this account for her own convenience, merely intending to insure that the joint tenants pay bills on her behalf.

Nor do we agree with respondents' contention that the records show that Celia "understandingly created" a joint account. Neither the signature cards nor the testimony of Bonnie Clyde requires us to so conclude. As the trial court noted in its findings, Clyde's testimony was unclear as to any discussion with Celia. Clyde stated that when she spoke with customers who wanted to add signatories, she customarily advised them about the differences between joint tenancy and power of attorney accounts. However, Clyde could not specifically recall such a discussion with Celia, but merely assumed based upon her "normal" practice that she spoke with Celia personally about the options. By contrast, Clyde's testimony that Celia created the account so that others could assist her in timely payment of her bills was clear and unequivocal.

Nor do the executed signature cards establish that Celia intended to create a joint tenancy with a right of survivorship. Clyde herself completed all information on the new signature cards, then sent them to Celia for her signature, enclosing a short, handwritten note which referred to "chang[ing] the title on your checking account" and "add-[ing] the two new co-signers." Celia's note to Clyde stated simply, "I am confirming both my brother Arthur M. Furlett and his son Joel B. Furlett to sign check [sic] on my current checking account." Notably, neither correspondence referred to a change in ownership interest or implied donative intent. Moreover, if Celia intended to make a gift to Arthur and Joel Furlett, a more logical vehicle would have been through her savings account or certificates of deposit at First Chicago. Although the signature cards present some evidence of donative intent, we believe that this documentary evidence, coupled with Clyde's note and Celia's note, is more consistent with an intention to create a power of attorney than with donative intent.

We also decline to infer, as respondents suggest, that the fact that Celia did not create a joint account at Peterson Bank indicates her understanding of the differences between the accounts. We believe that this evidence is equally consistent with the inference that Celia lacked donative intent regarding both accounts. Nor do we believe that the joint account's small percentage of Celia's total estate and Celia's gifts to Joel and his wife prior to her death prove donative intent in light of the other evidence which establishes its absence.

In sum, we believe that the evidence effectively rebuts the presumption of donative intent. Testimony reveals that Celia wanted her family to use the funds to take care of her and pay her bills. We find sufficient evidence to support the court's decision and see no basis to find that it was against the manifest weight of the evidence. Accordingly, we affirm the trial court's order granting the petition to compel the release of the checking account.

For the foregoing reasons, the judgment of the circuit court of Cook County finding that the 1937 will was joint and mutual is affirmed. The trial court's further finding that a joint account established by Celia Kaplan was an account of convenience rather than a true joint tenancy is also affirmed.

Judgments affirmed.

RAKOWSKI, P.J., and LaPORTA, J., concur.